UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES                    :

V.                               :        No. 3:07-CR-248(RNC)

THOMAS JULIUS                    :


RULING AND ORDER

The defendant is charged in a two count indictment with
unlawful possession of a pistol and ammunition, which he has
moved to suppress.  The pistol was discovered as a result of a
search conducted subsequent to the defendant's arrest in the
apartment of a third party, Shana Moseley, with whom the
defendant was staying after he absconded from state parole.
After the pistol was discovered, a more extensive search of Ms.
Moseley's apartment conducted pursuant to her written consent
uncovered the ammunition.  The motion to suppress has been the
subject of an evidentiary hearing and briefing.  In a prior oral
ruling, the motion to suppress the ammunition was denied on the
ground that Ms. Moseley's written consent was given voluntarily.[1]
The matter is now before me for a ruling with regard to the
validity of the initial search in the apartment that resulted in

_____

[1]  Defendant contends on the basis of an affidavit provided
by Ms. Moseley that she did not voluntarily consent to either the
officers' initial entry into the apartment or to the search that
uncovered the ammunition.  Her affidavit is contradicted by the
live testimony of the Government's witnesses at the suppression
hearing, which I find more reliable than Ms. Moseley's affidavit.

the discovery of the pistol.  The Government contends that this

search was lawful either as a search incident to arrest under

<u>Chimel v. California</u>, 395 U.S. 752 (1969), or as a special needs

parole search supported by reasonable suspicion.  I conclude that

the Government has not satisfied its burden of establishing the

validity of the search under either theory and therefore grant

the motion to suppress the pistol.

I.  <u>Facts</u>

On January 2, 2002, the defendant was sentenced in

Connecticut Superior Court to four years in prison followed by

four years of special parole for possession of narcotics with

intent to sell.  At the same time, he received a concurrent

sentence of four years in prison followed by four years of

special parole for a probation violation relating to a sex

offense.  On August 5, 2002, the defendant was sentenced to three

years and six months in prison, concurrent with the balance of

the term of imprisonment in the narcotics case, for possession of

a pistol without a permit.

On September 5, 2006, the defendant completed his term of

imprisonment and was placed on special parole under the

jurisdiction of the Board of Pardons and Paroles ("the Board"),

an executive agency located within the Connecticut Department of

Correction.  <u>See</u> Conn. Gen. Stat.§ 54-124a.  A person on special

parole is "subject to such rules and conditions as may be

2

established by the Board . . .." Conn. Gen. Stat. § 125e(b).
When a parolee is suspected of violating a parole condition, the
Board may hold a hearing; if a violation is established, the
Board may commit the parolee to prison for all or part of the
balance of the period of special parole.  See Conn. Gen. Stat. §
125e(d)-(f).

The defendant's parole conditions required him to live with
a sponsor in an approved residence, which his parole officer had
a right to visit at any reasonable time.  The defendant was
required to meet with his parole officer once a week, attend
weekly substance abuse counseling sessions, participate in sex
offender treatment, maintain compliance with the provisions of
the Connecticut Sex Offender Registry, and participate in a
program of electronic monitoring.  He was prohibited from
possessing a firearm, ammunition, illegal drugs, narcotics or
drug paraphernalia.  The defendant's parole conditions were
silent with regard to parole searches.[2]

On October 17, 2006, the defendant failed to attend his

_____

[2] The Board of Pardons and Paroles recently adopted a
standard parole condition permitting searches of a parolee's home
without individualized suspicion.  See Connecticut Board of
Pardons and Paroles, Standard Conditions of Parole No. 13 (May 6,
2008), *available at* http://www.ct.gov/doc/pdf/parole
conditions.pdf ("You shall be required to submit to a search of
your person, possessions, vehicle, business, residence or any
area under your control at any time, announced or unannounced,
with or without cause, by parole or its agent to verify your
compliance with the conditions of your parole.").  No such
condition was in effect at the time of the search at issue here.

weekly substance abuse counseling session.  He also failed to attend the following week.  The defendant's parole officer, Jose Cartagena, contacted the defendant's sponsor and learned that the defendant had vacated his approved residence.  Based on this information, Officer Cartagena received permission from his supervisor to remand the defendant into custody for violating the conditions of his special parole.  Officer Cartagena subsequently spoke with the defendant by telephone a number of times but the defendant refused to disclose his location and failed to turn himself in.  Accordingly, Officer Cartagena transferred the defendant's case to the Board's fugitive investigation unit, and the Board issued a warrant for the defendant's reimprisonment.[3]

About two months later, on February 20, 2007, Officer Cartagena learned from a confidential source that the defendant was living with Ms. Moseley in the Fair Haven section of New Haven.  Though the defendant's case had been transferred to the fugitive investigation unit, Officer Cartagena followed up on this tip himself.  His investigation confirmed that the defendant was staying with Ms. Moseley at her apartment on the first floor of a multifamily house at 189 English Street.  Officer Cartagena

---

[3]  The warrant directed any proper officer to arrest the defendant and deliver him to the custody of the Department of Correction pending a parole revocation hearing.  The Board may issue such a warrant based on a finding of probable cause that the parolee has violated a parole condition.  See Conn Gen. Stat. § 54-127; Conn. Agencies Regs. §§ 54-124a(J)(1)-1, 54-124a(J)(1)-4.

immediately notified the person in the fugitive investigation
unit responsible for the defendant's case, Daniel Barry.

Officer Barry reviewed the defendant's record and decided
that an attempt should be made to apprehend him the next day.
He contacted Deputy United States Marshal Charles J. Wood and
asked him to assist in apprehending the defendant.  Deputy Wood
testified that the Marshals Service works with Connecticut parole
officers on a "frequent basis."  Transcript of Suppression
Hearing ("Tr.") 111.[4]  Officer Barry also asked Officer Cartagena
to come along in a "secondary role."  Tr. 162.

The next morning, February 21, Officer Barry, Officer
Cartagena and three other parole officers met before going to
English Street.  They were joined by Deputy Wood.  Officer
Cartegena gave the group information about the defendant's
physical appearance and criminal record.  The officers then drove
to 189 English Street.  Officer Barry, Officer Cartagena and
Deputy Wood went to the front door of the Moseley residence; the
other officers took up positions at the side and rear of the
house.

At about 10:00, the officers began to knock on Ms. Moseley's
front door.  No one answered.  The officers continued to knock

_____

    [4]  The record indicates that there is a memorandum of
understanding between the Marshals Service and the Board pursuant
to which Deputy U.S. Marshals help the Board apprehend fugitives
when requested to do so.

for several minutes and still got no response.  A child who lived
upstairs emerged from her residence and was shown a photograph of
the defendant.  The child confirmed that the defendant was inside
the Moseley residence.

At about 10:10, the officers heard Ms. Moseley ask, "Who is
it?"  The officers replied, "Parole officers" and "Police."  Ms.
Moseley said she had to get dressed.  A few minutes later, she
opened the door.  Officer Barry asked Ms. Moseley if she knew why
they were there and she replied "No."  Officer Barry showed her
the photograph of the defendant, said they had a warrant for his
arrest, and asked if he was inside.  Speaking softly so as not to
be overheard by the defendant, Ms. Moseley indicated that the
defendant was in the rear of the apartment with her young son,
asked the officers to be careful of her son, then moved to the
side, permitting them to enter.  Deputy Wood and Officer Barry
entered with their guns drawn.  Officer Cartagena stayed behind
with Ms. Moseley.

Ms. Moseley's apartment contained a living room, kitchen,
bathroom and two bedrooms.  Deputy Wood and Officer Barry moved
from the front door, through the living room to the kitchen.
When Deputy Wood reached the kitchen, he looked through an open
doorway to an adjoining bedroom and saw the defendant lying on a
bed.  Deputy Wood called to the defendant by name and ordered him
not to move.  The defendant complied with the order.  Officer

Barry, who overheard Deputy Wood speak to the defendant, conducted a quick security check of the other bedroom and bathroom, then joined Deputy Wood.

The bedroom containing the defendant was small, about ten feet by ten feet, and cramped. The only area for walking was restricted to a narrow perimeter around the sides and foot of the bed. The head of the bed was against a wall on the officers' right as they entered. The defendant was lying on the far side of the bed. His head was close to the foot of the bed and his arms were over his head. He was wearing jeans and a t-shirt. Ms. Moseley's two-year-old son was lying in a similar manner closer to the officers. Both the defendant and the child were awake.

The officers moved to the defendant's side of the bed to take him into custody. Officer Barry took control of the defendant's arms, ordered him to sit up, and removed him from the bed with assistance from Deputy Wood. The defendant was placed in handcuffs with his hands behind his back. Officer Barry took the lead in handcuffing the defendant; Deputy Wood assisted. The handcuffs were close-fitting and double-locked. The defendant remained compliant throughout and offered no resistance.

Once the defendant was securely handcuffed, Officer Barry began to escort the defendant from the bedroom to the kitchen. He yelled to Officer Cartagena that the defendant was in custody.

Officer Cartegena notified the other officers, all of whom proceeded to enter the apartment.

As Officer Barry was escorting the defendant from the bedroom in handcuffs, Deputy Wood undertook to search the area in the vicinity of the bed to see if the defendant had discarded a weapon, narcotics or other contraband. Deputy Wood commenced the search by looking through some clothing and other items that were strewn on the floor along the side of the bed where the defendant was taken into custody. Nothing incriminating was found. Next, he lifted the mattress on the bed, which hung over the edge of the box spring by about a foot. Using both hands, he lifted the mattress eighteen inches or so, looked underneath, and saw a pistol. The handle of the pistol protruded slightly over the edge of the box spring. Deputy Wood yelled that he had found a gun, lowered the mattress and suspended the search.

Officer Barry was not sure what to do about the psitol. As he testified, "All we were there for was to find [the defendant] and take him into custody. We had done that. The weapon being found is out of our parameters or out of our scope of what we do." Tr. 178. After some discussion between Officer Barry and Deputy Wood, the New Haven Police Department was contacted and asked to come to the apartment to deal with the pistol.

Deputy Wood then asked Ms. Moseley for permission to search the apartment. Ms. Moseley told Deputy Wood that she wanted to

speak with her mother first.  Ms. Moseley contacted her mother by telephone.  Her mother was concerned about the situation and went to the apartment to help.  After further discussion, Ms. Moseley signed a form giving the officers consent to search the apartment.  New Haven police officers subsequently conducted a search that included removing the mattress from the box spring in the bedroom where the defendant was arrested.  When the mattress was removed, the officers discovered a magazine containing 24 .45 caliber rounds.  This is the ammunition that provides the basis for the charge in count two.

II.  Discussion

    A.  Search Incident to Arrest

    Under Chimel, the permissible scope of a search incident to an arrest in a dwelling is limited to the arrestee's person and the area within his "immediate control," which is defined as "the area from within which he might gain possession of a weapon or destructible evidence."  395 U.S. at 763.  When Deputy Wood lifted the mattress to see what might be underneath, the area under the mattress was not within the defendant's immediate control as defined in Chimel.  Officer Barry and the defendant were near the doorway to the bedroom, about eight to ten feet away from Deputy Wood.  The defendant, who is about 5'4", was under the control of Officer Barry, who is 6'7".  Both Officer Barry and Deputy Wood were positioned between the defendant and

the area under the mattress on the side of the bed where the
pistol was found.  To gain access to that area, therefore, the
defendant would have had to break free from Officer Barry, push
Officer Barry out of the way, move to the opposite side of the
bed, kneel with his back to the bed, and reach behind his back
into the area between the mattress and box spring, all without
being stopped by Officer Barry or Deputy Wood.  It is
inconceivable that he could accomplish this while securely
handcuffed behind his back.

In United States v. Blue, 78 F.3d 56 (2d Cir. 1996), the
defendant moved to suppress a machine gun discovered between a
mattress and box spring after the defendant was removed from the
mattress, handcuffed behind his back and placed face-down on the
floor.  The issue raised by the motion to suppress was whether
the area between the mattress and box spring was within the
defendant's "immediate control" as defined in Chimel.  The
District Court declined to suppress the machine gun relying on
United States v. Hernandez, 941 F.2d 133 (2d Cir. 1991), which
upheld a search under the outer edge of a mattress because it was
within the grab area of a handcuffed detainee.  The Second
Circuit concluded that Hernandez was not controlling because the
officer who conducted the search in that case planned to put the
handcuffed detainee back on the bed in a position where she could
reach under the mattress if left unattended even for a brief

time, which was a distinct possibility because the multi-room apartment contained three other suspects.  In <u>Blue</u>, in contrast, the apartment consisted of a single room, the defendant and his confederate were guarded by an officer who stood over them at all times, and three more officers were in the immediate vicinity. "Given the small size of the one-room apartment and the fact that [the defendant and his confederate] were secured during the entire time in question, there was no possibility that either one of them could reach deep into the interior of the bed without being stopped . . .."  78 F.3d at 60.

Under the principles of <u>Chimel</u>, as applied in <u>Blue</u> and <u>Hernandez</u>, the search in this case can be sustained only if the evidence permits a finding that there was some risk the defendant could reach into the area where the gun was located after he was taken away in handcuffs by Officer Barry.  The Government urges that a reasonably prudent officer in Deputy Wood's position would believe that the area under the mattress was within the defendant's grab area after he was arrested.  Govt.'s Supp. Mem. at 11.  In support of this contention, the Government states that "the search through the clothing and underneath the mattress began instantaneously with the defendant's removal from the bed to the corner of the room where the firearm was found and lasted only a few seconds as the defendant was being escorted around the bed by Officer Barry."  <u>Id.</u> at 12.  I do not agree with the

Government's statement of the facts.  Deputy Wood began the
search after the defendant was handcuffed.  <u>See</u> Tr. 149-50.  His
search through the clothing and other items on the floor took
more than a few seconds.  By his own estimate, the cursory search
took nearly a minute.  Tr. 147.  By the time Deputy Wood lifted
the mattress, the defendant was on the opposite side of the bed
near the doorway.  The defendant was securely under the control
of Officer Barry the entire time.  On these facts, it cannot be
said that the area under the mattress was within the defendant's
immediate control as defined in <u>Chimel</u>.

In support of its contention that the area under the
mattress was properly searched incident to the defendant's
arrest, the Government states that "other rooms in the house had
not been 'cleared' and third parties could have been hiding in
closets or other spaces."  Govt.'s Supp. Mem. at 11.  The
Government's reliance on the risk posed by unseen third parties
is unavailing because "the justification for the search incident
to arrest considered in <u>Chimel</u> [is] the threat posed by the
arrestee, not the safety threat posed by the house, or more
properly by unseen third parties in the house."  <u>Maryland v.
Buie</u>, 494 U.S. 325, 336 (1990).  More to the point, the evidence
discloses no objective basis for a concern about unknown third
parties hiding in Ms. Moseley's apartment.  When the officers
knocked on Ms. Moseley's door, they had no information that

anyone other than Ms. Moseley and the defendant might be there.

Their interaction with Ms. Moseley before entering the apartment

gave them no indication that anyone else was present other than

the defendant and Ms. Moseley's son.  If anything, Ms. Moseley's

cooperation with the officers, her use of a soft voice to prevent

the defendant from overhearing, and her expression of concern

about her son's safety indicated that an unidentified third

person was unlikely to be present.  After entering the apartment,

Officer Barry and Deputy Wood walked through the living room and

kitchen.  Deputy Wood then proceeded toward the bedroom where the

defendant was apprehended, while Officer Barry conducted a visual

security check of the other bedroom and bathroom.  Based on their

testimony at the suppression hearing, Officer Barry believed

nobody else was in the apartment and Deputy Wood also felt secure

at the time.

    The Government contends that, in any event, Deputy Wood's

search under the mattress may be sustained as a search incident

to arrest because the area under the mattress was within the

defendant's immediate control just before he was arrested.  No

Second Circuit precedent is cited in support of the proposition

that the area of an arrestee's immediate control under Chimel is

to be determined based on circumstances that existed just before

the arrest rather than at the time of the search.  The

Government's position is supported, however, by cases decided by

other circuits.  See United States v. Williams, 483 F.3d 425, 430
(6th Cir. 2007); United States v. Abdul-Saboor, 85 F.3d 664, 668
(D.C.Cir. 1996); United States v. Turner, 926 F.2d 883, 888 (9th
Cir. 1991).  The approach taken in these cases permits officers
to handcuff and remove an arrestee from an area then search the
area from within which he could have grabbed a weapon or evidence
before he was handcuffed and removed, provided the arrest and
search are reasonably contemporaneous or parts of a single
transaction.  As applied to the facts of the present case, this
approach would permit a search of a considerable area in the
bedroom after the defendant was taken away in handcuffs, one
arguably encompassing not only the bed, the floor around the bed
and the area under the mattress, but also the top of a nearby
dresser, possibly one or more dresser drawers, one or two clothes
hampers and a closet.

The cases cited by the Government reflect the view that if
an area in a dwelling can be lawfully searched under Chimel
before the arrestee is handcuffed and removed, a subsequent
search of the same area should not be considered unreasonable
under the Fourth Amendment.  "The weakness of this argument," as
Justice Scalia has pointed out in another context, "is that it
assumes that, one way or another, the search must take place.
But conducting a Chimel search is not the Government's right; it
is an exception – justified by necessity – to a rule that would

otherwise render the search unlawful."  Thornton v. United States, 541 U.S. 615, 627 (2004)(Scalia, J., concurring).

In Chimel, the scope of the search-incident-to-arrest exception was severely curtailed in accordance with two Fourth Amendment principles:

first, that a warrantless search of a home cannot be sustained unless "'the exigencies of the situation made that course imperative.'"  395 U.S. at 761 (quoting McDonald v. United States, 335 U.S. 451, 455-56 (1948); and

second, that "the scope of [a] search must be strictly tied to and justified by the circumstances which rendered its initiation permissible."  395 U.S. at 762 (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968).

Chimel requires officers to abide by these principles when conducting an area search incident to an arrest in a dwelling. If the arrestee is incapable of reaching into an area, a search cannot be justified by the interests in protecting the arresting officer and preserving evidence.  Lacking any such justification, the search can be sustained only if it falls within another exception to the warrant requirement.

The Chimel Court pointed out that in Terry, decided the previous year, a patdown of a suspect's outer clothing was sustained "because it was 'no more than a protective search for weapons[,]" Chimel, 395 U.S. at 762 (quoting Terry, 392 U.S. at

15

20), while in a companion case, <u>Sibron v. New York</u>, 392 U.S. 40 (1968), a contrary result was reached because the policeman's thrusting of his hand into the suspect's pocket "had been neither motivated by nor limited to the objective of protection.  Rather, the search had been made in order to find narcotics, which were in fact found."  <u>Chimel</u>, 395 U.S. at 762.  The <u>Chimel</u> Court stated that "[a] similar analysis underlies the 'search incident to arrest' principle, and marks its proper extent."  395 U.S. at 762.

The Court then stated:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise the officer's safety might well be endangered, and the arrest itself frustrated.  In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.  And the area into which an arrestee might reach in order to grab a weapon or evidentiary item must, of course, be governed by a like rule.  A gun on a table or drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested.  There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control" - construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs – or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself.  Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.  The

16

"adherence to judicial processes" mandated by the
Fourth Amendment requires no less.

395 U.S. at 751-52.

Since Chimel was decided, neither the Supreme Court nor the
Second Circuit has approved of a search incident to an arrest in
a dwelling in the absence of exigent circumstances.[5]
Accordingly, I conclude that the search in this case, like the
search in Blue, exceeded the scope of a properly limited search
incident to an arrest in a dwelling.[6]

---

[5]  Since Chimel, the Supreme Court has held that a lawful
custodial arrest entitles officers to conduct a thorough search
of the arrestee's person regardless of whether the officers have
reason to think the search will uncover a weapon or destructible
evidence.  See United States v. Robinson, 414 U.S. 218, 235
(1973).  The Court has also held that a lawful custodial arrest
of an occupant of a vehicle entitles officers to conduct a full
search of the vehicle's passenger compartment.  See New York v.
Belton, 453 U.S. 454, 460 (1981).  The latter rule applies even
when the officer does not encounter the arrestee until after the
arrestee has left the vehicle.  See Thornton v. United States, 541
U.S. 615, 623-24 (2004).  Though these cases depart from the
rationale of Chimel by permitting searches in the absence of
exigent circumstances, they do not signal that a search in a
dwelling may be valid under Chimel when there is no exigency.
The Fourth Amendment permits routine searches of persons and
vehicles lawfully in police custody.  In the absence of consent,
however, a warrantless search in a home requires exigent
circumstances.

[6]  The Government relies on United States v. Hill, 2005 WL
3113206,*11 (D. Conn. Nov. 18, 2005), which held that a bullet
proof vest was properly seized incident to the defendant's arrest
in his girlfriend's home because the vest was in plain view when
the police entered.  Judge Kravitz's opinion states that even if
the vest was covered by a sheet, as the defendant claimed, its
seizure was permissible incident to the defendant's arrest
because it was lying on a couch only two or three feet away from
the defendant when he was arrested and placed in handcuffs, and
the seizure occurred virtually simultaneously with the arrest.

B.  <u>Special Needs Parole Search</u>

The Government contends that the warrantless search conducted by Deputy Wood was justified by the special needs of the parole system, which require that parolees be subject to searches on no more than reasonable suspicion.  The defendant counters that, at the time of the search, no Connecticut statute, regulation, judicial decision, court order or parole condition authorized a search of his residence on less than probable cause. I conclude that, assuming the standard required to justify the search conducted by Deputy Wood is reasonable suspicion, the Government has not met its burden of demonstrating that this standard was satisfied.

In <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 872-73 (1987), the Supreme Court upheld a warrantless search of a probationer's residence based on reasonable suspicion.  The Court concluded that the state's special need for adequate supervision of the probationer's compliance with probation conditions outweighed the probationer's legitimate expectation of privacy.  Ten months later, in <u>State v. Smith</u>, 207 Conn. 152, 174 (1988), the Connecticut Supreme Court held that the standard required by the Fourth Amendment to justify a urinalysis test of a probationer is

_____

As I read the decision in <u>Hill</u>, it is faithful to the Second Circuit's reasoning in <u>Hernandez</u> and <u>Blue</u>, and does not purport to adopt a more expansive approach to the proper scope of a search incident to arrest.

reasonable suspicion.  In addition to <u>Griffin</u>, the <u>Smith</u> court relied on a Fifth Circuit decision, <u>United States v. Scott</u>, 678 F.2d 32, 35 (5th Cir. 1982), which held that a parole officer did not violate the Fourth Amendment when, acting on the basis of reasonable suspicion, she obtained incriminating evidence from a parolee during a home visit in order to provide the evidence to postal inspectors conducting a criminal investigation.  <u>Scott</u>, in turn, relied on a Second Circuit decision, <u>United States ex rel. Santos v. New York State Board of Parole</u>, 441 F.2d 1216, 1218 (2d Cir. 1971), which upheld a parole officer's search of a parolee's home because there were "reasonable grounds" for investigating his suspected involvement in the sale of stolen goods.

The Government contends that the search conducted by Deputy Wood qualifies as a special needs parole search.  But Officer Cartagena was no longer supervising the defendant at the time of the search.  The defendant was an absconder whose period of supervision had been tolled pending his apprehension and return to actual custody.  Moreover, the parole officers had nothing to do with the searches that took place in Ms. Moseley's apartment. Officer Barry had no interest in searching the premises.  As he testified, "All we were there for was to find [the defendant] and take him into custody.  We had done that.  The weapon being found is out of our parameters or out of our scope of what we do."  Tr. 178.  Even after the firearm was discovered, Officer Barry took

no part in seeking Ms. Moseley's consent to search the premises because it was outside the "scope" of his work.  Tr. 179.

Though the special needs rationale is ill-suited to the search in this case, the defendant's diminished expectation of privacy justifies use of a lesser standard than probable cause.[7] In <u>Samson v. California</u>, 547 U.S. 843 (2006), the Supreme Court upheld a police officer's suspicionless search of a parolee pursuant to a state statute without considering whether the search was justified by a special need under <u>Griffin</u>.  <u>See</u> <u>id.</u> at 852 n.3.  The Court emphasized that parolees "have severely diminished expectations of privacy by virtue of their status alone."  <u>Id.</u> at 852.  <u>See also</u> <u>Griffin</u>, 483 U.S. at 875 (parolees are subject to "a degree of impingement upon privacy that would not be constitutional if applied to the public at large"); <u>U.S. v. Massey</u>, 461 F.3d 177, 179 (2d Cir. 2006)(parolee's reasonable expectation of privacy less than that of ordinary citizen); <u>U.S. v. Grimes</u>, 225 F.3d 254, 258 (2d Cir. 2000)(parole justifies some departure from traditional Fourth Amendment standards).  The Second Circuit has observed that when, as in this case, a parolee is charged with violating his parole conditions and a warrant for his reimprisonment has been issued, the parolee is removed "one

---

[7]  The defendant's legitimate expectation of privacy as an overnight guest in Ms. Moseley's apartment was no greater than the one he could assert with regard to his approved residence. <u>See</u> <u>United States v. Taylor</u>, 482 F.3d 315, 318 (5th Cir. 2007).

step farther from the constitutional protection enjoyed by ordinary citizens." <u>U.S. v. Polito</u>, 583 F.2d 48, 55 (2d Cir. 1978).

Assuming that the standard required by the Fourth Amendment to support the search in this instance is reasonable suspicion, the Government has not met its burden of justifying the search. An officer lacks reasonable suspicion for a search unless he is able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Terry</u>, 392 U.S. at 21. Inarticulate hunches or generalized suspicions are insufficient to provide the minimum level of objective justification required for reasonable suspicion. <u>See</u> <u>id</u>. at 27 (in determining whether officer acted reasonably, due weight must be given, not to his inchoate and unparticularized suspicion or hunch, but to specific reasonable inferences he is entitled to draw from the facts in light of his experience). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors – quantity and quality – are considered in the 'totality of the circumstances' – 'the whole picture,' <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981), that must be taken into account when evaluating whether there is reasonable suspicion." <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990).

"A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion . . . ." United States v. Sokolow, 490 U.S. 1, 10 (1989). In this case, Deputy Wood did not testify that he believed he had reasonable suspicion to search under the mattress for contraband. His testimony shows that he searched under the mattress simply because it was within the area of the defendant's immediate control just before the arrest. In other words, he conducted a purely exploratory search to see what he might find.

Nonetheless, the Government contends that the search under the mattress was supported by reasonable suspicion. Like probable cause, reasonable suspicion is often based on a tip. See White 496 U.S. at 331-32 (reasonable suspicion based on detailed anonymous tip); Adams v. Williams, 407 U.S. 143, 1465-47 (1972)(reasonable suspicion based on known informant's tip). A review of reported cases shows that reasonable suspicion to search a parolee's residence has been found when officers acted on the basis of a tip. See United States v. Blake, 2008 WL 2610474,*6 (10th Cir. July 3, 2008)(probationer's positive urinalysis combined with information indicating that she and her husband were involved in drug trafficking sufficient to establish reasonable suspicion for search of residence) State v. Cruz, 144 Idaho 906, 174 P.3d 876 (Idaho Ct. App. 2007)(reasonable

22

suspicion existed to search apartment of parolee's girlfriend based on tip that he was violating his parole conditions by living there and processing and selling drugs).  In this case, the officers had no information that the defendant was recently in possession of a firearm or narcotics.

The Government's argument that the officers had reasonable suspicion to search under the mattress boils down to this: (1) the defendant had a criminal record including convictions for possession of a firearm and narcotics; (2) the defendant was an absconder from parole; (3) Ms. Moseley took ten minutes to respond to the officers' knocking at her door; and (4) the mattress was askew.  These factors, viewed collectively, did not provide reasonable suspicion that the defendant was hiding a weapon or narcotics under the mattress.  The defendant's criminal record and status as an absconder provided no particularized basis for suspecting that he was presently in possession of a weapon or narcotics.  See United States v. Freeman, 479 F.3d 743, 749 (10th Cir. 2007)(defendant's parolee status and criminal history, without other particularized and objective facts, insufficient to provide reasonable suspicion to conduct search of residence);  United States v. Payne, 181 F.3d 781, 790-91 (6th Cir. 1999)(absconder's past drug offenses did not provide reasonable suspicion to search home); People v. Lampitok, 207 Ill.2d 231, 798 N.E.2d 91 (2002)(violation of reporting condition

does not provide reasonable suspicion to search for drugs).  Nor did the delay in opening the door.  This leaves only the mattress being askew.  The Government's theory appears to be that because the mattress was off-center, an experienced officer could reasonably infer that the defendant had hastily concealed a gun or narcotics under the mattress.  In this case, the mattress being askew was insufficient to support such a reasonable inference because the bedroom itself was in a state of disarray and the defendant had ample time to conceal a gun or contraband elsewhere in the apartment.

III.  <u>Conclusion</u>

Accordingly, the motion to suppress the pistol is hereby granted.

So ordered this 7th day of August 2008.


                              _____/s/ RNC_____
                                   Robert N. Chatigny
                              United States District Judge